IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EMILY LOGAN, on behalf of :
MATTHEW LOGAN, :
     Plaintiff :
:   **CIVIL ACTION NO.  3:04-1472**
v. :
: (JUDGE NEALON)
NORFOLK SOUTHERN RAILWAY :
COMPANY and NORFOLK :
SOUTHERN CORPORATION, :
    Defendants :

DIANE MORIN, Parent and Natural :
Guardian of ROBERT MORIN, a minor, :
     Plaintiff :   **CIVIL ACTION NO. 3:04-2449**
:
v. : (JUDGE NEALON)
:
NORFOLK SOUTHERN RAILWAY :
COMPANY and NORFOLK :
SOUTHERN CORPORATION, :
    Defendants :

**MEMORANDUM AND ORDER**

On July 7, 2004, defendants filed a Notice of Removal of a personal injury

action brought by Emily Logan, on behalf of Matthew Logan, from the  Luzerne

County Court of Common Pleas to the Middle District of Pennsylvania. (Logan Doc.

1).  On November 10, 2004, Diane Morin, Parent and Natural Guardian of Robert

Morin, filed a complaint seeking damages for personal injuries in this court.  (Morin,

Doc. 1).  Both plaintiffs advance negligence claims which allegedly stem from an

accident which occurred on April 13, 2002 on the defendants' property.  Both minor

plaintiffs claim that they suffered personal injuries as a result of defendants'

maintaining a dangerous condition which created an unreasonable risk of harm to

children on the premises.

On April 1, 2005, defendants filed a motion seeking summary judgment in both

of the above captioned cases.  (Logan Doc. 44, Morin Doc. 19).  In support of their

Briefs in Opposition, plaintiffs filed the affidavits of Anthony Franzosa and Robert

Macuch, two previously unidentified witnesses.  (Logan Doc. 53, Morin Doc. 28).  The

defendants filed Motions to Strike both affidavits and plaintiffs requested an

opportunity for a site inspection.   In response, the court granted the parties an

additional twenty (20) days within which to: (1) depose Franzosa and Macuch; (2)

conduct a site inspection;  and (3) file supplemental briefs.  Both parties have filed

supplemental briefs and the summary judgment motions are now before the court for

disposition.  Inasmuch as both cases arise from the same set of operative facts and

involve the same incident the court will write one opinion and ruling on the motions.

Since material issues of fact remain to be decided on the issue of negligence, the

defendants' motions for summary judgment will be denied in part.  However, the

defendant will be granted summary judgment on the punitive damages claims.

2

## I.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56( c).  See also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986); Young v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992).  Once such a showing has been made, the nonmoving party cannot rely upon conclusory allegations in its pleadings or briefs to establish a genuine issue of material fact.  Rather, the nonmoving party must go beyond the pleadings and offer specific facts contradicting the facts averred by the movant which indicate that there is a genuine issue for trial.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188 (1990); Fed. R. Civ. P. 56(e).  "Once the moving party has carried the initial burden of showing that no genuine issue of material fact exists, [citation omitted] the nonmoving party . . . 'must make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by the depositions and admissions on file.'"  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (quoting Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)).

To determine whether the nonmoving party has met his or her burden, the court

must focus on both the materiality and the genuineness of the factual issues raised by the non-movant.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986) (emphasis in original).  A disputed fact is material when it could affect the outcome of the suit under the governing substantive law.  Id., 477 U.S. at 248, 106 S. Ct. at 2510.  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.  If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 1592 (1968)).  All inferences, however, "should be drawn in the light most favorable to the nonmoving party, and where the nonmoving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  Pastore, 24 F.3d at 512 (quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912, 113 S. Ct. 1262 (1993).


**II.    STATEMENT OF FACTS**

Matthew Logan ("Logan") was born on April 9, 1991 and at the time of the accident was eleven years old. (Docs. 20, 45, ¶1). Robert Morin was born on December 11, 1989 and was twelve years old at the time of the accident. (Docs. 20, 45, ¶2). On Saturday, April 13, 2002, Logan and Morin along with a friend, Derrick Sipple, were on the property[1] ("Property") of Norfolk Southern Railway Company ("Norfolk Southern") . (Docs. 28, 53, p.5). The three boys returned to an area of the Property where they had previously erected a wooden wall. (Docs. 28, 53, p. 5). They intended to build a clubhouse on this site. (Docs. 20, 45, ¶ 4, Docs. 28, 53, p. 5). This portion of the Property included a "fire ring" which was made from cement blocks (Docs. 28, 53, p. 4-5) and was presumably used by unknown persons for the purposes of burning wood, paper and other flammable items. At the time of the accident, the fire ring contained charred remains of wood and various other objects including, but not limited to, aerosol paint cans.

In order to construct their clubhouse, the three boys gathered wooden pallets from other areas of the Property and brought them to the fire ring area. (Morin Dep.,

---

[1]The Norfolk Southern property is located in Hazleton, Pennsylvania and is bounded by Poplar Street on the west and Broad Street on the south. (Macuch Dep., p. 14).   It contains an engine house, a row of buildings and an open gravel parking lot with a yard office. (Doc. 28, p.4, Doc. 53, p. 4). The terminal buildings are located on the Poplar Street side of the property and railroad tracks extend from either side of the terminal buildings throughout the parcel of land. (Macuch Dep., p. 47).   Some portions of the property are wooded but the majority of the lot is open. The property may also include a bike track but at the very least abuts a bike track. (Doc. 28 p. 4, Doc. 53, p. 4). The record does not indicate the total acreage of the property nor does it establish what roads form the northern and eastern borders of the property.

p.43, Logan Dep., p.47).  They noticed an approximately five (5) foot tall "wall" of

wooden pallets in the fire ring area.  (Morin Dep., p. 44).  In this same area, the boys

came across a box of flares in a wooden box.  (Docs. 20, 45, ¶¶ 5-6).  Each of the

three boys removed flares from the box, lit them and threw them into the fire ring.

(Docs. 20, 45, ¶ 7, Docs. 23, 48, ¶ 7).  Shortly thereafter an aerosol can which was in

the fire ring combusted and the resulting explosion burned both Logan and Morin.

(Docs.  28, 53, p.6).

Upon being burned, Logan and Morin went to Morin's house for help.[2]  (Docs.

28, 53, p. 6).  From there, Morin's father took him to Hazleton St. Joseph's Hospital

and Logan's mother, having been summoned to the Morin home, took Logan to

Hazleton General Hospital.  (Docs. 28, 53, p.6).  Ultimately both boys were taken to

Lehigh Valley Hospital via helicopter. (Docs. 28, 53, p.6).

In their respective complaints, Logan and Morin allege that the defendants'

negligence in maintaining their property was the direct and proximate cause of the

burns and injuries sustained by them.  They further contend that the defendants'

failure to properly maintain their property was outrageous behavior constituting

reckless disregard for the safety of children and which, accordingly, merits an award

of punitive damages.

---

[2] The boys ran water over their burns at a gas station where they stopped en route to the Morin
home.  (Docs. 28, 53, p.6).

In their summary judgment motions, the defendants argue that the plaintiffs cannot recover since they fail to meet the requirements of the Restatement (Second) of Torts, §339.  Further, the defendants allege that the plaintiffs have failed to produce any evidence which would support a claim of punitive damages under Pennsylvania law.

## III.    Negligence Claims under §339

In order for plaintiffs to succeed on their negligence claims they must establish that defendants owed them a duty and that defendants breached this duty resulting in injury to the plaintiffs.  The plaintiffs have asserted liability based on the Restatement (Second) of Torts, § 339, which has been adopted in Pennsylvania and, therefore, the court's examination will be limited to those principles governing the duty owed to children trespassers.   Additionally, there is no argument before the court regarding the defendants' status as "possessor" of the land where the accident occurred.

Section 339 provides as follows:

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by the artificial condition upon the land if:

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass; and
(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children; and
(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it; and
(d) the utility to the possessor of maintaining the condition and the burden

of eliminating the danger are slight as compared with the risk to children involved; and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

Restatement (Second) of Torts, §339.

All five requirements of section 339 must be satisfied in order for a landowner to be liable.  Jesko v. Turk, 421 Pa. 434, 437, 219 A.2d 591, 592 (1966).  Since the facts of record, drawn in the light most favorable to plaintiffs, are sufficient to support a claim under Section 339, the defendants' Motions for Summary Judgment on the negligence claims will be denied.

### (a) Knowledge or Reason to Know of Children Trespassers

A landowner has "reason to know" of children trespassers if "he has information from which a person of reasonable intelligence ... would infer that the fact in question exists ....  It is not enough that the possessor 'should know' of trespasses in the sense that a reasonable man in his position would investigate to discover the fact. The possessor is under no duty to make any investigation or inquiry as to whether children are trespassing, or are likely to trespass, until he is notified, or otherwise receives information, which would lead a reasonable man to that conclusion."  Rest. 2d Torts, § 339, Comment G.  Further, "toleration of trespass for a sufficient time ... adds to the duties of the occupier in the maintenance and use of his premises."

Bartleson v. Glen Alden Coal Co., 361 Pa. 519,  525, 64 A.2d 846, 850 (1949)

*quoting* <u>Hogan v. Etna Concrete Block Co.</u>, 325 Pa. 49, 51, 188 A. 763, 764 (1936).

Having tolerated trespassers, the landowner cannot "thereafter disregard the likelihood

of their presence in the conduct of his operations ... or in the maintenance ... of

hazardous conditions." <u>Bartleson</u> at 526, 64 A.2d at 850 *quoting* <u>Altenbach v. Lehigh

Valley R. Co.</u>, 349 Pa. 272, 275, 37 A.2d 429, 430 (1944).

At his deposition Morin testified that he had been on the property "a couple of

times" dating back to third grade[3] and that he had specifically been in the area of the

fire pit a "couple times" while he and his friends were building a clubhouse.  (Morin,

Dep. 30-32).  He further testified that he would cut through the railroad property a

couple of times a week en route to his friend's house.[4]  (Morin Dep. 37).

Additionally, he stated that there was a "person-wide path" which led from Green

Street[5] to the fire pit area.  (Morin Dep., p. 50).  Likewise, Logan testified that he had

previously passed through the railroad property "a couple of times" totaling about

twenty (Logan Dep. pp. 28, 34) and that he had been in the fire pit area approximately

seven (7) times prior to the day of the accident.  (Logan Dep.  p. 58).

---

[3]Both Logan and Morin were in fifth grade at the time of the accident.  (Logan Dep., p. 18, Morin Dep.,  p. 23).

[4] Logan and Morin both testified that they often left Morin's home, which is located on the corner of Cedar and Green Streets on the northeastern side of the Property and cut diagonally across the Property to the southwest corner where Derrick Siple lived.  In making this journey they traditionally walked down the Broad Street side of the Property and would have entered the Property on the Poplar Street side.  (Logan Dep., pp. 31-33, Morin Dep., pp. 35-37).

[5] Green Street runs perpendicular to Poplar Street on the western side of the Property.

Richard Hertzog, who was yardmaster at the railroad property at the time of the accident, testified that kids on bikes sometimes cut through the defendants' property. (Hertzog Dep. p. 62).  Steven Shaw, Norfolk Southern Supervisory Special Agent, conceded that the railroad has recorded written complaints of children trespassing on the property.  Specifically, the railroad had ten (10) reported incidents for the Hazleton yard during the two (2) years immediately preceding April 13, 2002.  Some of these ten (10) internal security reports were for trespassing, including ejections of juvenile trespassers.  (Shaw Dep., pp. 32-35).  Shaw further explained that all observed instances of trespassing were not necessarily documented since the reports for trespassing required entry of the offender's name.  (Shaw Dep., 30).  Finally, the railroad was aware of the existence of a BMX track approximately 100  feet from the fire ring. (Morin Dep., p. 31, Hertzog Dep., p.62).   Since the general public used this track it would appear that the defendants should have been aware that trespassers might also enter the nearby railroad property.

Former Hazleton City Police Chiefs, Anthony Franzosa ("Franzosa") and Robert Macuch ("Macuch"), have provided extensive deposition testimony confirming the fact that children trespassed on the Property during the period between 1976-2000.  Specifically, the Hazleton Police were called to the Property by Conrail[6] employees "on more than an occasional basis" because of children trespassing on

---

[6] The property was previously owned by Conrail but is now owned by defendants.

bikes or quads.  (Macuch Dep., p. 16).  Macuch specifically recalls one occasion when

he apprehended "as many as 10, 12 kids that had been partying" on the Property.

(Macuch Dep., p. 21).  He recounts that trespassers were common throughout the

Property but particularly in the North Eastern quadrant and in the area East of the

railroad buildings which is where the accident occurred.  (Macuch Dep., pp. 23-26).

Additionally, the Conrail police officer notified Macuch that Conrail was "having lots

of problems with kids" (Macuch Dep., 28) and that the police identified the property

as an area that needed additional patrolling.  (Macuch Dep., p. 67).   Finally, Macuch

was contacted on several occasions by Conrail employees about smoke and/or fire on

the Property.  (Macuch Dep., p. 45).  Franzosa recalls a similar history of child

trespassers on the Property and, although he was never summoned to investigate any

fires, he did see campfires on the property.  (Franzosa Dep., p. 30).

These cumulative facts would  tend to support a finding that the railroad had, or

should have had, notice of the fact that people, including children, were likely to

trespass throughout its property.   While it is noted that Franzosa and Macuch left the

police force two (2) years prior to the accident, it remains for a jury to determine the

significance of their testimony, together with that of other witnesses,  regarding a

history of trespassers on the Property.  At the very least, the facts taken in a light most

favorable to the plaintiffs, could support a finding that the defendants were or should

have been aware that trespassing throughout their property was likely to occur.

Defendants argue that just because a landowner has notice that children are trespassing on one part of his land does not necessarily mean the landowner knows about trespasses occurring on other portions of the land. See Whigham v. Pyle, 224 Pa. Super. 6, 302 A.2d 498 (1973). The facts of record do not establish that trespassing was limited to a specific location but rather that there was widespread trespassing throughout the property including the fire pit area. Therefore, a jury could find that defendants had or should have had knowledge of trespassing throughout the general property and not solely of trespassing limited to a confined area. Based on the evidence as a whole, a factfinder might also reasonably find that the defendants should have been aware that children at least occasionally crossed through the defendants' property and spent time in the area of the fire ring.[7]

### (b) Knowledge of Existence of Condition and Awareness of Risk

The artificial condition in the instant case consists of unattended flares on the property and the existence of a fire ring which contained charred wood and aerosol cans. Initially, defendants' argument that it did not create the condition complained of must be addressed. The possessor need not have created the artificial condition nor do anything to maintain it so long as he knows, or has reason to know, of its existence and realizes, or should realize, its danger to children. Rest. 2d Torts, § 339, Comment

---

[7] While Defendants may have presented contradictory testimony, such conflicts must be resolved in favor of the Plaintiffs.

D. A landowner is considered to "maintain" an artificial condition on his land when he has knowledge of and allows an artificial condition created by another to exist. Cooper v. City of Reading, 392 Pa. 452, 459, 140 A.2d 792, 795 (1958).

The standard for determining knowledge is the same standard as considered in the first prong of the claim. Specifically, a possessor has no duty to police his land in order to discover the condition but when he knows, or has reason to know, that a dangerous condition may exist on his property and that it will involve an unreasonable risk of harm to children, he is subject to liability for not taking steps to rectify the danger.

Defendants point to the testimony of Hertzog to establish that the defendants kept their flares in cardboard boxes which were locked in vehicles, equipment and storage buildings. (Hertzog Dep., pp. 85, 119-123). Accordingly, the defendants maintain that they had no knowledge of wooden boxed flares in any other location on the property. Moreover, the defendants did not keep records of incoming and outgoing flares. (Hertzog Dep., p.88). Therefore, it is argued, that even if flares were missing from their containers, the defendants would not have had any reason to know of their absence or the possibility that the flares were left unattended on the property. The deposition testimony of the young Plaintiffs and Jessica Morin tend to undercut this theory. Specifically, Jessica stated that she saw over thirty (30) unused flares along the tracks on the way to the fire pit. Further, she explained that she saw two or

13

three unused flares in the area of the fire pit. (Jessica Morin Dep., p. 25).   Jessica was

on the property twice after the accident: once to recover her brother's glasses the day

of, or day after, the accident and a few days later with some of her family.  She

testified that the flares were present on both occasions.  (Jessica Morin Dep., 27).  If

Jessica's recollection were believed then, coupled with the knowledge of children

trespassing, of fires on the premises, the presence of a security guard who patrolled

the property, the possession and use of flares by the defendants, and the nearness of

flares to the tracks of an active operation, a jury might reason that the railroad should

have known about the presence of the flares which were laying alongside operating

tracks.

There is no evidence that the defendants created or maintained the fire pit or

that they discarded the aerosol cans in this pit.   Hertzog, the corporate designee,

testified during his deposition that he had never seen the fire pit nor did he know how

it was created.   (Hertzog Dep., pp. 62-64).  Had the railroad created or maintained the

fire pit then it clearly would have had knowledge of its existence.  Absent any

evidence of creation or maintenance or other direct knowledge it remains only to be

determined whether there is evidence that the defendants should have known of the

fire pit's existence.

According to the record, the fire pit was located forty seven (47) feet and two

(2) inches from the railroad's southern tracks, eighty-nine (89) feet from the railroad's

northern tracks and one hundred sixty (160) feet from the railroad parking lot.  (Docs., 41, 67, pp. 2-3).  Further, at the time of the accident, the defendants employed a security guard who regularly patrolled the area in question.  (Shaw Dep., p. 9).  Additionally, during the course of his employment with the Hazleton Police, Macuch was called to the property on several occasion because of fires.  (Macuch dep., p.45).  Arguably, the proximate presence of defendants' employees to the fire pit coupled with a history of fires occurring on the property, should have provided the defendants with knowledge that a fire pit may have been one of the sources, which should have been located and eliminated.

Even if plaintiffs can establish that defendants should have had knowledge of the existence of the condition, they must also show that defendants knew or should have known that the condition "involved an unreasonable risk of death or serious bodily harm" to the children.  Bruhn v. L.B. Smith, Inc., 1993 WL 764630, *3 (Cumberland Co. 1993).   There is nothing of record to indicate that the defendants would  consider either the flares or the fire ring to be anything but dangerous conditions.  Railroad employees have offered testimony regarding the dangers of both conditions and of a resultant fire.  (Hertzog Dep., p. 75, Shaw Dep., p. 54).  A fire ring containing charred material, a history of fires on the Property, and the presence of flares nearby, would justify a jury's finding that the Defendants should realize the risk to children.

### *( c) Realization of Danger by Children*

In order to succeed on their claims, the plaintiffs must next show that because of their young ages, they failed to understand the danger of intermeddling with the dangerous condition, i.e. the fire pit and flares.  A possessor has a duty to exercise reasonable care in preventing trespassing by children in an area which contains a danger either not observable by children or which contains a risk the full extent of which is beyond a child's realization.  Rest. 2d Torts, §339, comment I.  However, a possessor is relieved of liability if a child finds the condition and appreciates its full risk but nonetheless chooses to encounter it out of recklessness or bravado.  Rest. 2d Torts, § 339, comment C.

The defendants argue that both Logan and Morin fully understood the dangers involved with playing with the flares and/or fire.  (Docs. 32, 57, pp. 2-3).  In support of their argument the defendants point to the testimony of both Logan and Morin that they knew what the flares were and that they knew they could receive burns by playing with flares.  (Logan Dep., pp. 53-54; Morin Dep., pp. 54-55).  Logan further testified that he knew that there were paint cans and aerosol cans in the fire ring and that he knew paint cans could explode if they were heated.  (Logan Dep., pp. 62-64).  There is also evidence of record that when Morin was younger he accidently started a fire with matches at his parents' home and was reprimanded for so doing.  (Jessica

Morin Dep., p. 46).   This testimony may indicate that Morin would appreciate the dangers of playing with fire.

Nonetheless, "the Pennsylvania courts have repeatedly ruled that the jury should decide the question of a child's appreciation of hazards which an adult would perceive clearly." Novicki v. Blaw-Knox Co., 304 F.2d 931, 934 (3d Cir. 1962) *citing* Cooper v. Reading, 392 Pa. 452, 140 A.2d 792 (1958); Hyndman v. Pennsylvania R.R., 396 Pa. 190, 152 A.2d 251 (1959); Bartleson v. Glen Alden Coal Co., 361 Pa. 519, 64 A.2d 846 (1949); Kuhns v. Brugger, 390 Pa. 331, 135 A.2d 395 (1957).   "The care and caution required of a child is measured by his capacity to see and appreciate danger, and he is held only to such measure of discretion as is usual in those of his age and experience; this being necessarily a varying standard, the question is ordinarily one for the jury and not for the court." Cooper v. City of Reading, 392 Pa. 452, 464, 140 A.2d 792, 798 (1958).

There seems no doubt that the plaintiffs were both aware that lit flares could burn them.  However they have not stated that they appreciated the danger at the time they threw the flares into a dormant fire pit.  Morin testified that he threw his flare because the smoke from it was burning his eyes (Morin Dep., p. 57) and Logan offered similar testimony that he threw his flare because "it was making lots of smoke."  (Logan Dep., p. 57).   A jury might find that, while the boys understood the danger of holding a burning flare, they did not fully appreciate the danger of throwing

17

a lit flare in that manner.

Morin has testified that he did not see any paint cans in the fire pit (Morin Dep., p. 58) and has offered no statement that he knew that the presence of paint cans could cause an explosion.  While Logan testified that he knew paint cans could explode if heated it remains unclear whether he realized the risk involved, i.e., did he appreciate that an explosion might occur at that time and the extent of the consequences of an explosion because of the presence of paint cans.  A jury might reasonably conclude that once the boys released the lit flares from their hands into the fire pit they thought that any possible danger had ceased.

The Pennsylvania courts have held that realization of danger is a jury decision in all but the most clear cut and narrowly defined instances.  Most notably among these case are the "falling" cases which have held that "even young children must be held as a matter of law to understand that if one falls from a high place he is likely to be injured." Novicki v. Blaw-Knox Co., 304 F.2d 931, 934 (3d Cir. 1962).  However, the likelihood of being injured as a result of falling from a high place would be more apparent than throwing a flare into a dormant fire pit even if there were paint cans present.  Thus, this issue must be resolved by a jury.

### (d) Utility of Maintaining and Burden of Eliminating Danger

The Defendants have not addressed this prong of the Section 339 analysis.

18

Hertzog did testify that there was no reason for flares to be kept freely about the property. (Hertzog Dep., p.72). Likewise, there is no fact of record indicating that the defendants actually used the fire pit for any business purpose. Presumably there was no utility for either condition. Similarly, the defendants do not explain the burden involved in eliminating the danger. On the facts presented one could conclude that under the circumstances there was in fact no burden in eliminating the danger by destroying the fire pit and securing the flares.

Clearly these are not determinations of law and remain instead to be decided by a jury upon full consideration of the facts presented and the credibility of the parties. At the very least, the current facts of record do not preclude the plaintiffs from establishing their case under the fourth prong of the 339 analysis.

### (e) Defendants' Failure to Exercise Reasonable Care

"The amount of care required must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question." Yanofsky v. Commonwealth, 133 Pa. Commw. 323, 325, 437 A.2d 92, 93 (1988) *quoting* Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850 (1945). Therefore, it is necessary to determine what consequences are foreseeable and the potential gravity of those consequences before defining reasonable care in a particular set of circumstances. In applying the requirements of section 339, the New Jersey

Superior Court held that the possessor's duty to use reasonable care "is triggered by the foreseeability of the presence of the intruder, and the foreseeability of an unreasonable risk of harm. No inflexible rule can be set forth concerning the prophylactic measures which must be taken in a particular case." Healing v. Security Steel Equipment Corp., 51 N.J. Super. 123, 137, 143 A.2d 844, 852 (1958) *citing* Strang v. South Jersey Broadcasting Co., 9 N.J. 38, 45, 86 A.2d 777, 780 (1952). "Except in the clearest case, the determination of the question of whether reasonable care was exercised is for the jury." Id.

As is always the case, the fundamental test for negligence is the failure to exercise reasonable care under the particular circumstances involved in the action. Smith v. Philadelphia Transportation Co., 173 F.2d 721, 725 (3d Cir. 1949) *cert. denied*, 338 U.S. 819, 70 S. Ct. 63 (1949).  There are no hard and fast rules set forth under section 339 regarding that which should be considered reasonable care.  Further, since a determination of reasonableness in the instant case turns on prongs (a) and (b) of the Restatement analysis a resolution of this final issue must remain for the jury to determine upon first reaching findings on those two issues.

## IV.  Punitive Damages

In order for a plaintiff to be permitted to make a punitive damages claim against a defendant, the plaintiff must clearly demonstrate that the defendant has engaged in

outrageous conduct, defined as acts done with bad motive or with a reckless

indifference to the rights or interests of others.  SHV Coal, Inc. v. Continental Grain

Co., 526 Pa. 489, 587 A.2d 702 (1991); Chambers v. Montgomery, 411 Pa. 339, 192

A.2d 355 (1963).  The plaintiff must demonstrate that the alleged conduct of the

defendant was intentional, reckless or malicious.  Rizzo v. Haines, 520 Pa. 484, 555

A.2d 58 (1989).

The facts of record do not support a finding that defendants acted in an

outrageous manner.  There is no evidence that the defendants, knowing that children

were trespassing, acted or failed to act, with bad motive or reckless indifference to the

presence of children on the Property.  There is likewise no evidence that defendants

acted in a manner which would recklessly encourage children to trespass.  To the

contrary,  the record establishes that defendants employed part-time security to patrol

the property in addition to keeping a record of trespassers and seeking police

protection.   Accordingly, the defendants' Motions for Summary Judgment on this

ground will be granted.


Date: July 7, 2005                                    s/ William J. Nealon_____
                                                      United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMILY LOGAN, on behalf of | : | |
| MATTHEW LOGAN, | : | |
|     Plaintiff | : | **CIVIL ACTION NO.  3:04-1472** |
|     v. | : | (JUDGE NEALON) |
| NORFOLK SOUTHERN RAILWAY | : | |
| COMPANY and NORFOLK | : | |
| SOUTHERN CORPORATION, | : | |
|     Defendants | : | |
| | : | |
| | : | |
| DIANE MORIN, Parent and Natural | : | |
| Guardian of ROBERT MORIN, a minor, | : | |
|     Plaintiff | : | **CIVIL ACTION NO. 3:04-2449** |
| | : | |
|     v. | : | (JUDGE NEALON) |
| NORFOLK SOUTHERN RAILWAY | : | |
| COMPANY and NORFOLK | : | |
| SOUTHERN CORPORATION, | : | |
|     Defendants | : | |

<u>ORDER</u>

**AND NOW**, this 7th  day of July, 2005, in accordance with the accompanying

Memorandum of this date,  **IT IS HEREBY ORDERED THAT** Defendants'

Motions for Summary Judgment are GRANTED in part and DENIED in part:

(1) the Motions are DENIED as they pertain to Plaintiffs' negligence claims; and

(2) the Motions are GRANTED as they pertain to Plaintiffs' claims for punitive

damages.


s/  William J. Nealon
United States District Judge